**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Miguel Angel Andradez Materan,<br><br>Petitioner,<br><br>-v-<br><br>Raul Maldonado, Jr., *Warden, Metropolitan Detention Center*, Judith Almodovar, *New York Field Office Director for U.S. Immigration and Customs Enforcement*, Todd Blanche, *Attorney General of the United States*, Todd M. Lyons, *Acting Director, U.S. Immigration and Customs Enforcement*, Markwayne Mullin, *Secretary of Homeland Security*,<br><br>Respondents. | 2:26-cv-03185 (NJC) |

**MEMORANDUM AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

On May 27, 2026, Miguel Angel Andradez Materan filed this Petition seeking a writ of habeas corpus under 28 U.S.C. § 2241 to challenge the lawfulness of his detention by Immigration and Customs Enforcement ("ICE"). (Petition for Writ of Habeas Corpus, ECF No. 1.) The Petition alleges that Mr. Andradez Materan was released on his own recognizance shortly after entering the United States in 2023, but that ICE detained him on May 4, 2026 without notice and an opportunity to be heard in violation of his rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the Immigration and Nationality Act (the "INA"), and the Administrative Procedure Act (the "APA"). The Petition also argues that ICE's arrest of Mr. Andradez Materan was made without probable cause in violation of the Fourth Amendment to the U.S. Constitution. The Petition seeks a writ of habeas corpus requiring Respondents to

immediately release Mr. Andradez Materan and reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, among other things.[1]

Respondents are federal government officials named in their official capacities: (1) Raul Maldonado, Jr., Warden of the Metropolitan Detention Center, (2) Judith Almodovar, New York Field Office Director for ICE, (3) Todd Blanche, Attorney General of the United States,[2] (4) Todd M. Lyons, Acting Director of ICE, and (5) Markwayne Mullin, U.S. Secretary of the Department of Homeland Security ("DHS"). They argue that ICE detained Mr. Andradez Materan under 8 U.S.C. § 1226(a) ("Section 1226(a)"), a statute that provides the DHS with discretionary authority to "arrest and [detain] . . . an alien, like Petitioner, pending a decision on whether he is to be removed from the United States." (Mem. Resp. at 1, ECF No. 11.) Respondents contend that the Petition should be dismissed as premature for failure to exhaust available administrative remedies because an ICE officer determined on May 4, 2026 that Mr. Andradez Materan posed a risk of danger to persons or property, and Mr. Andradez Materan's request for an immigration judge to review that determination was purportedly pending when Respondents filed their response to the Petition. (Mem. Resp. at 1, 4–7.) They also argue that Mr. Andradez Materan violated the terms of a 2023 order that released him on his own recognizance (the "OREC"), which prohibited him from committing any violation of local, state, or federal

[1] The Petition also seeks an order prohibiting Mr. Andradez Materan's removal from the United States and transfer from the Eastern District of New York pending adjudication of the Petition. (Pet. at 25.) The Court has granted such relief through the issuance of the May 28, 2026 Stay of Removal and Order to Show Cause, which prohibits Respondents from removing Mr. Andradez Materan from the United States or transferring him outside of the Eastern District of New York, Southern District of New York, and District of New Jersey absent further order of the Court. (*See* ECF No. 4.)

[2] The Petition names Blanche in his official capacity as Acting Attorney General. Since then, the Senate confirmed Blanche to serve as the Attorney General. Accordingly, the caption is amended by virtue of this Opinion and Order to reflect this change.

laws or ordinances, based on the fact that he was arrested by Nassau County police for grand larceny in the fourth degree on May 4, 2026. (Supp. Resp. at 4–6.) Respondents maintain that ICE was free to revoke the OREC and detain Mr. Andradez Materan without providing him any opportunity to be heard regarding the basis for the revocation. (*Id*. at 6–8.)

On reply, Mr. Andradez Materan challenges the "sequence of events" by which "Petition[er] was taken into custody by ICE and deprived of his liberty." (Reply at 2.) Thus, the parties' dispute centers around the timing and procedures by which ICE arrested and detained Mr. Andradez Materan, including the procedures by which ICE determined that he violated a release condition and should be detained pending removal proceedings.

On June 5, 2026, this Court held an evidentiary hearing at which Mr. Andradez Materan and various ICE officers and supervisory officials testified. At the conclusion of the hearing, this Court ordered Respondents to release Mr. Andradez Materan on bail subject to conditions pursuant to its authority under *Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2011). The Court determined that the Petition raises substantial due process claims regarding the procedures used to detain Mr. Andradez Materan and that extraordinary circumstances made the grant of bail necessary to make any habeas remedy effective. (Min. Entry, June 5, 2026; Sealed Order, ECF No. 17; ECF No. 18.)[3] Specifically, the Court noted that the Petition brings a substantial due process claim that Mr. Andradez Materan was detained without notice and opportunity to be heard due to his arrest prior to any process and the subsequent revocation of his OREC in a process that lasted around one minute or less and involved consideration of little other than his

[3] Contrary to Respondents' characterization, the Court did not "conditionally grant[] the Petition" (Resp. Supp. at 2 n.2), but ordered Mr. Andradez Materan's release on bail subject to release conditions after due analysis of the *Mapp* factors.

immigration status and the May 4, 2026 arrest by Nassau County police. (June 5 Hr'g Tr. 192:5–195:19.)

The Court now rules on the merits of Mr. Andradez Materan's due process claim. The facts are critical. As a threshold matter, Mr. Andradez Materan was arrested by ICE officers, and therefore deprived of his liberty, before *any* government official with the authority to revoke the 2023 OREC granting him release on his own recognizance had actually made the decision to revoke release. Equally troubling are the post-hoc procedures undertaken by ICE to justify the deprivation of Mr. Andradez Materan's liberty without affording him any opportunity to be heard. After the ICE arrest was well underway, an ICE official revoked the OREC in a cursory proceeding—a phone call with a subordinate that lasted around one minute or less and involved consideration of little more than the facts that Mr. Andradez Materan entered the United States without authorization in 2023, was released shortly thereafter on an OREC, and had been arrested just hours earlier for grand larceny in the fourth degree. The OREC was revoked without any individualized determination of flight risk or dangerousness or any opportunity for Mr. Andradez Materan to be heard on those issues or the facts surrounding the grand larceny arrest. To make matters worse, around one hour *after* the OREC was revoked, the ICE officer who authorized the arrest in the first instance conducted a pro forma custody determination—the outcome of which had already been determined by the OREC revocation decision: that Mr. Andradez Materan would be detained pending removal proceedings in immigration court.

The Fifth Amendment Due Process Clause guards against the arbitrary deprivation of liberty by, among other things, requiring adequate notice and an opportunity to be heard. The facts before this Court raise a substantial claim that ICE violated Mr. Andradez Materan's right to procedural due process. For this reason and others, Mr. Andradez Materan is excused from

any requirement to exhaust administrative remedies by first pursuing an appeal from what was, at best, a post-hoc, pro forma custody determination. Here, Respondents' invocation of exhaustion is particularly troubling because, as discussed below, Respondents failed to even transmit Mr. Andradez Materan's request to pursue such administrative remedies until *after* the Petition was filed in this Court.

ICE officers arrested Mr. Andradez Materan pursuant to Section 1226(a). That statute and its implementing regulations require a DHS officer to conduct an individualized determination of whether a noncitizen presents a risk of flight or dangerousness *and* to afford the noncitizen an opportunity to be heard on these critical issues before the decision to detain is made. Here, Mr. Andradez Materan was arrested first and post-hoc efforts to justify that decision followed: first, a perfunctory OREC revocation involving a brief phone call that featured no individualized consideration of flight risk or dangerousness or opportunity for Mr. Andradez Materan to be heard; and then, around one hour later, a pro forma custody determination that simply ratified the detention decision already made during the OREC revocation.

Such superficial and post-hoc procedures create a substantial risk that even persons who do not pose a risk of flight or dangerousness will be deprived of their liberty. Yet the private interests adversely impacted by these procedures are substantial. ICE detention infringed on Mr. Andradez Materan's liberty interest in being free from detention and separated him from his family, including his U.S. citizen child who depends on him for financial support. It also threatened to impair his ability to contest his criminal and immigration charges in light of ICE's failure to take any steps to ensure that he could appear for critical proceedings in both courts, which were scheduled for the same date and time. Moreover, although the government has an interest in ensuring appearance at immigration proceedings and guarding public safety,

Respondents fail to show that affording Mr. Andradez Materan a timely opportunity to be heard, such as through an initial custody determination that preceded or was contemporaneous with his arrest and the revocation of his release would impair those interests.

ICE's detention of Mr. Andradez Materan under Section 1226(a) therefore violated his rights to procedural due process under the Fifth Amendment Due Process Clause and was unlawful from its inception. The Petition is therefore granted in part. Because this Court released Mr. Andradez Materan on bond and subject to conditions on June 5, 2026, the appropriate relief at this time is to release Mr. Andradez Materan from the conditions of release imposed by this Court.

## FACTUAL FINDINGS[4]

### I. Mr. Andradez Materan's Entry into the United States

Mr. Andradez Materan is a 28-year-old Venezuelan national who resides in Flushing, Queens. (Pet. ¶¶ 8, 23.) He entered the United States on October 1, 2023, by crossing the southern border near El Paso, Texas, where he encountered an unnamed United States Border Patrol ("USBP") agent. (Pet. ¶ 22; Costakis Decl. ¶ 6.) That same day, USBP served Mr. Andradez Materan with a Notice to Appear, Form I-862, which required him to appear for an August 20, 2024 proceeding in immigration court at 26 Federal Plaza, New York, NY 10278. (Costakis Decl. ¶ 7; *see* Oct. 1, 2023 NTA, ECF No. 11-1 at 6–8.) The Notice to Appear asserts that Mr. Andradez Materan was subject to removal under 8 U.S.C. § 1182(a)(6)(A)(i) and was

[4] At the June 1, 2026 Show Cause Hearing, counsel for Mr. Andradez Materan withdrew certain allegations in the Petition that were based on incorrect information. This includes the allegations that Mr. Andradez Materan "was driving a vehicle that was stopped by Nassau County Police," that "[t]he police officer issued a summons for lack of insurance card and driving without a license," and that "[t]he police officer then contacted ICE, which arrived at the location of the traffic stop and took Petitioner into custody . . . ." (June 1, 2025 Hr'g Tr. 3:18–4:15.)

placed "[i]n removal proceedings under section 240 of the Immigration and Nationality Act," which are codified at 8 U.S.C. § 1229a. (Oct. 1, 2023 NTA.) USBP released Mr. Andradez Materan that same day, on October 1, 2023, due to lack of approved bedspace and served him with a Form I-220A, Order of Release on Recognizance, which is referred to as an "OREC." (*See* OREC.)

The OREC indicates that CBP released Mr. Andradez Materan "[i]n accordance with section 236 of the Immigration and Nationality Act" and sets forth certain enumerated release conditions, which among other things, require Mr. Andradez Materan to report for hearings and interviews as directed by ICE and the Executive Office for Immigration Review (the "EOIR") and to surrender for removal if ordered to do so. (*See* OREC.) The OREC provides, "You must not violate any local, State, or Federal laws or ordinances." (*Id.*) According to the OREC, failure to comply with the release conditions set forth in the order "may result in revocation of . . . release and . . . arrest and detention by Immigration and Customs Enforcement." (ECF No. 2-2 at 1.)

On June 13, 2024, Mr. Andradez Materan filed a Form I-589 application for asylum, withholding of removal, and protection under the Convention against Torture. (Costakis Decl. ¶ 9; *see* Form I-589, ECF No. 1-3.) On May 26, 2026, he requested more time to obtain representation in his removal proceedings. (Costakis Decl. ¶ 10.) At the time the Petition was filed, Mr. Andradez Materan's next appearance in immigration court was scheduled for June 9, 2026. (*Id.*)

On or around April 28, 2025, USCIS granted Mr. Andradez Materan work authorization, which is valid from April 28, 2025 until April 27, 2030. (Form I-765, ECF No. 1-4.)

## II. Mr. Andradez Materan's 2026 Arrest by Nassau County Police

On the morning of May 4, 2026, Mr. Andradez Materan and two other individuals were driving in Nassau County looking for scrap metal, which involved "go[ing] to shops and places and ask[ing] if they have any scrap metal to throw out." (June Hr'g Tr. 137:9–10.) Mr. Andradez Materan "saw some metal objects thrown on the side of the road, and . . . took them to recycle." (*Id.* 131:4–11, 137:5–6.) The metal objects were "the arms" of a forklift, which were found "in front of a house" in Oceanside, New York. (*Id.* 136:11–18.) Mr. Andradez Materan noticed that "a car came and followed" his vehicle, and he was stopped by Nassau County police officers shortly thereafter. (*Id.* 131:12–16.)

The police officers accused Mr. Andradez Materan and his companions of trespassing into a private yard and stealing scrap metal. (*Id.* 131:20–24.) Mr. Andradez Materan disputes the accusation and maintains that the metal he took was "on the side of the road." (*Id.* 131:20–132:4.) He tried to explain his account of the facts to the NCPD officers in Spanish, but the officers did not speak Spanish and had no interpreter present. (June Hr'g Tr. 146:12–19.) Due in part to the language barrier, Mr. Andradez Materan and the others were "not allow[ed] . . . to speak much" while Nassau County police arrested them. (*Id.* 131:20–132:4.)

The Nassau County police officers transported Mr. Andradez Materan and the others to the Fourth Precinct, which is located at 1699 Broadway, Hewlett, New York 11557. (Costakis Decl. ¶¶ 16–17.) There, they issued him a desk appearance ticket, which required Mr. Andradez Materan to appear in the First District Court, Nassau County, Arraignment Part, on May 20, 2026, to answer to the accusation of grand larceny in the fourth degree under NYPL § 155.30(1). (May 4, 2026 Desk Appearance Ticket, ECF No. 11-1 at 22–25.) This court date was later adjourned to June 9, 2026. (ECF No. 11-1 at 26.)

## III. ICE's Pre-Arrest Procedures

a. NCPD Phone Call and ICE Records Check

On May 4, 2026, at approximately 4:17 p.m., someone from Nassau County police called ICE Acting Assistant Field Office Director Tony Petito to inform him that Nassau County police had arrested Mr. Andradez Materan and two other "foreign nationals" for "trying to take some property and some equipment."[5] (June 5 Hr'g Tr. 37:14–18; 120:14–23.) Shortly thereafter, Petito called ICE Supervisory Detention and Deportation Officer John C. Diaz and provided the same information to him. (*Id*. 6:11–13.)

Diaz checked certain ICE databases for records relating to Mr. Andradez Materan and "instructed [his] officers," including ICE Detention and Deportation Officer Demetrios Costakis, to do the same. (*Id*. at 7:11–12, 8:14–15; 88:11–20.) The records check included "EARM, eJustice, NCIC, Planet, CPMS, [and] BIA," which Diaz described as "all of the normal databases that we check on a daily basis when we are conducting arrests or investigations." (*Id*. at 7:15–19.)[6] Diaz did not have Mr. Andradez Materan's A-File, which provides a "history of the subject's immigration history," but testified that such information would have been included in records stored in the aforementioned databases. (*Id*. 9:21–10:12.) As a result of the records

[5] One of the two individuals arrested by Nassau County police alongside Mr. Andradez Materan was also subsequently subject to ICE arrest and detention and filed a petition for a writ of habeas corpus in a separate action before this Court. *See Martinez Adauto v. Maldonado et al*., No. 2:26-cv-03784 (E.D.N.Y.). There, Respondents invoke 8 U.S.C. § 1226(c)(1)(E), rather than Section 1226(a) as the basis for detention, even though both were arrested and issued desk appearance tickets for grand larceny in the fourth degree by Nassau County police at the same time and were then arrested by ICE in the NCPD Fourth Precinct at the same time and transported by ICE together to the ICE processing center adjacent to the Nassau County Jail.

[6] Officer Diaz testified that EARM provides information about where a noncitizen is detained and "what's going on with their immigration case" while Planet contains the notes of government immigration attorneys and case updates concerning removal proceedings. (June 5 Hr'g Tr. 7:22–8:5, 8:7–13.)

check, Diaz "learned that Petitioner was currently under immigration proceedings," that he had come in contact with the Criminal Alien Program (CAP)[7] because he "had multiple encounters with local PD, and [that] he had been convicted of disorderly conduct." (*Id.* 8:18–9:8.)

Records before this Court show that on January 27, 2024, Mr. Andradez Materan was arrested for petit larceny (N.Y. Penal Law § 155.25), criminal possession of stolen property in the Fifth Degree (N.Y. Penal Law § 165.40), and disorderly conduct (N.Y. Penal Law § 240.20). (ECF No. 11-1 at 11–13.) However, that day, he pled guilty only to disorderly conduct—a violation for which the maximum penalty is 15 days of imprisonment—and was sentenced to a conditional discharge. (*Id.* at 13.) Nearly one year later, Mr. Andradez Materan was arrested for theft of services under N.Y. Penal Law § 165.15(3) and criminal possession of a controlled substance in the 7th degree under N.Y. Penal Law § 220.03, but those charges were dismissed on March 19, 2025. (ECF No. 11-1 at 14–17.)

On March 12, 2025, Mr. Andradez Materan was arrested for assault in the third degree under N.Y. Penal Law § 120.00(1) and harassment in the second degree under N.Y. Penal Law § 240.26(1). (ECF No. 11-1 at 18–21.) On March 19, 2025, he pled guilty to disturbance/violent behavior under N.Y. Penal Law § 240.20(1), which carries a maximum penalty of 15 days imprisonment, and was sentenced to a conditional discharge. (*Id.* at 21.)

b. <u>ICE's Decision to Arrest and Detain Mr. Andradez Materan</u>

Diaz testified that, as a result of his check for records relating to Mr. Andradez Materan, he made a determination at approximately 5:30 p.m. that Mr. Andradez Materan should be arrested, although he did not document his reasoning in writing. (June 5 Hr'g Tr. 20:2–14; 33:7–

[7] Officer Diaz explained that the Criminal Alien Program "is a program" and "database" that tracks a person's contact with local or federal law enforcement . . . . " (June 5 Hr'g Tr. 9:9–20.)

11.) According to Diaz, there are no written standards governing how he should make a decision to detain a noncitizen and that ICE officers "basically have some sort of leeway if we want to recommend release or an alternative to detention." (*Id.* 31:16–17.)

Diaz made his decision to arrest Mr. Andradez Materan based on "the fact that the I-220A," the 2023 OREC releasing Mr. Andradez Materan on his own recognizance, "states that the individual should not violate any criminal laws." (*Id.* 32:1–3.) He also found pertinent that Mr. Andradez Materan "had about three or four other encounters . . . within our databases, he had been known to us for sometime." (*Id.* 36:9–13.) Diaz directed a subordinate to generate a Form I-200 Arrest Warrant for Mr. Andradez Materan. (*Id.* 10:21–23.) He signed the warrant at approximately 5:30 p.m. on May 4, 2026 and dispatched Costakis and Demetrius Vrahnas, another ICE Detention and Deportation Officer, to conduct the arrest. (*Id.* 11:3–10; 20:23–21:6.)

## IV. Mr. Andradez Materan's Arrest

Costakis and Vrahnas arrived at the NCPD Fourth Precinct at approximately 6:00 p.m. (June 5 Hr'g Tr. 87:5–21; 89:24–90:1.) With the assistance of a Nassau County detective who spoke Spanish and interpreted, Costakis asked Mr. Andradez Materan "a series of pedigree questions" for identification purposes. (*Id.* 89:19–23; Costakis Decl. ¶ 17.) However, neither Costakis nor Vrahnas informed Mr. Andradez Materan that ICE believed he had violated a condition of the OREC. (June 5 Hr'g Tr. 148:7–24.) The arrest was completed by approximately 6:20 p.m. (Costakis Decl. ¶ 17.)

## V. OREC Revocation

At some time between approximately 6:22 p.m. and 7:00 p.m., Diaz called Assistant Field Office Director ("AFOD") Bryan Flanagan to ask him to cancel Mr. Andradez Materan's OREC. (June 5 Hr'g Tr. 12:19–23; 57:1–5; 63:9–12.) According to testimony from both Diaz

and Flanagan, their conversation lasted "probably under a minute." (*Id.* 37:23–38:3; 74:9–11.) Flanagan testified that Diaz "informed [him] that the subject entered in roughly around 2023, and was released on an Order of Recognizance on Release," but that he was not made aware of Mr. Andradez Materan's full criminal history. (*Id.* 58:1–3; 65:16–18.) However, Diaz testified that he provided Flanagan "a quick synopsis of [Mr. Andradez Materan's] history pertaining to criminal and immigration," including that he had been arrested for "a felony, a grand larceny charge" and had previously been issued an OREC. (*Id.* 38:6–9; 59:14–17.) Based on the officers' testimony, the call was brief and focused on Mr. Andradez Materan's entry into the United States in 2023, his release pursuant to an OREC shortly thereafter, and the fact he was arrested for the grand larceny arrest earlier that day. Diaz recommended the detention of Mr. Andradez Materan, and Flanagan "agreed with [Diaz's] assessment . . . ." (*Id.* 38:19–22; 65:9–15.) After the call, Diaz sent Flanagan a copy of the OREC revocation for his signature. (*Id.* 64:24–65:4.)

Flanagan testified that the accusation of grand larceny in the fourth degree, a felony, against Mr. Andradez Materan "was a material change in [Mr. Andradez Materan's] original custody determination" and justified the revocation of release on his own recognizance. (*Id.* 66:21–67:16.) Flanagan acknowledged that Nassau County police accused Mr. Andradez Materan through a desk appearance ticket and did not detain him. According to Flanagan, an arrest based on an accusation is sufficient to show that Mr. Andradez Materan violated the condition of his OREC that he not commit any violation of law. (*Id.* 80:10–20.)

## VI. Mr. Andradez Materan's Processing in ICE Detention

Officers Costakis and Vrahnas transported Mr. Andradez Materan and the two others with whom he was arrested to an ICE intake center at 100 Carman Ave., East Meadow, New York, which is adjacent to the Nassau County Correctional Center. (Costakis Decl. ¶ 17; June 5

Hr'g Tr. 6:23–7:4, 132:16–19.) Aside from the pedigree questions that Costakis asked him at the Fourth Precinct, the ICE officers did not communicate with Mr. Andradez Materan during the arrest or transport. (June 5 Hr'g Tr. 148:3–6.) Costakis explained, "[T]heir English wasn'[t] too good, and there's also like a Plexiglas[s] that separates the front seats. So it was too hard . . . too hard to communicate, so we just had to wait until we got back." (*Id*. 92:3–8.)

At the ICE intake center, ICE Detention and Deportation Officer Dhanraj Totoram asked Mr. Andradez Materan questions related to the completion of a Form I-213 Report of Deportable/Inadmissible Alien. (*Id*. 99:8–100:16; *see also* ECF No. 13.) With Diaz interpreting in Spanish, Totoram documented Mr. Andradez Materan's responses into the Form I-213, which took around one hour. (*Id*. 100:14–16.) Totoram did not ask Mr. Andradez Materan about the circumstances of his arrest by Nassau County police because "our arrest was a civil immigration arrest. It wasn't -- had anything much to do with his criminal. That was already done." (*Id*. 104:12–16.) While completing the Form I-213, Totoram also consulted various databases, including the National Criminal Information Center ("NCIC"), Treasury Enforcement Communication System ("TECS"), "U-PASS, CIS, PCQS, EARM," and "CPMS" databases. (*Id*. 100:17–23; 106:3–20.)

After Totoram processed the arrest, Diaz served Mr. Andradez Materan with the Form I-200 arrest warrant, a Nassau County Trailer Notice of Rights form, a consular notification form, an ICE detainee locator form, and the OREC Revocation Form, which was signed by Flanagan. (June 5 Hr'g Tr. 13:20–14:4; 16:17–17:2.) According to Diaz, he informed Mr. Andradez Materan of his rights, including his right not sign any documents without an attorney present. (*Id*. 40:19–41:2.) Mr. Andradez Materan testified that he was not informed of any right to call an attorney. (*Id*. 152:5–14.)

## VII. The Custody Determination

At approximately 7:49 p.m., Diaz, who is "very proficient" in Spanish, interviewed Mr. Andradez Materan and reviewed his immigration and criminal history. (Diaz Decl. ¶ 9; June 5 Hr'g Tr. 15:1–2.) This interview lasted somewhere "between 15, or 20 minutes." (June 5 Hr'g Tr. 15:12–13; 39:21–22.) Diaz "asked him about his health status," "about children, marriage," "if he paid taxes, if he was employed." (June 5 Hr'g Tr. 15:4–7.) Mr. Andradez Materan told Diaz that he "[has] a child who's very young, but that [his] wife does not work," and that he is "the head of the family." (*Id.* 133:14–18.)

According to Diaz, he also "asked [Mr. Andradez Materan] what happened on this particular date" that led to his arrest, to which Mr. Andradez Materan responded that "he was not aware that he was on someone's private property" and that he "believed that that equipment had been abandoned." (*Id.* 39:4–14.) Mr. Andradez Materan testified, however, that the ICE officers "didn't let me explain. They just told me that I had violated my conditions and that's why I was there." (*Id.* 145:1–3.)

According to Diaz, Mr. Andradez Materan responded to "some questions" but "for others, he didn't want to respond without counsel." (June 5 Hr'g Tr. 15:9–11.) Mr. Andradez Materan asked if "there was any chance of being released" and was told "that there was no chance." (*Id.* 133:18–19.) He also asked whether the fact that his son is a U.S. citizen could help him with his immigration status, and was told that it would not. (*Id.*) Mr. Andradez Materan testified, "[t]hey were filling out their forms and then they told us to be quiet." (*Id.* 144:4–5.)

Diaz decided to detain Mr. Andradez Materan "based on the totality of the circumstance[s]." (*Id.* 14:11–12.) He concluded, "based on records checks," that Mr. Andradez Materan "had violated his order of release, and he had prior contact with law enforcement

that . . . he was on our radar at some point and we were not able to track him down." (June 5 Hr'g Tr. 14:10–16.) He found that "evidence of Petitioner's multiple and recent criminal arrests, which constituted a violation of his conditions of release . . . evidenced that Petitioner would be a danger to property or persons if released." (Diaz Decl. ¶ 10.) Officer Diaz documented this custody determination in two places: (1) an INA § 236(a) Initial Custody Determination Form, or "*Velesaca* form," which only applies to individuals initially arrested and detained by ICE's ERO-NY Office pursuant to a settlement agreement in *Velesaca v. Decker*, No. 20-cv-1803 (S.D.N.Y.), and (2) a Form I-286, Notice of Custody Determination. (*See* June 5 Hr'g Tr. 17:3–25; *see also* Velesaca Form, ECF No. 14 at 3–5; Diaz Decl. ¶ 9; *see also* Notice of Custody Determination, ECF No. 11-1 at 30.)

With respect to the *Velesaca* form, it is undisputed that Mr. Andradez Materan, who was initially detained in Texas, does not fall within the *Velesaca* class. Diaz testified that he completed the *Velesaca* form as a "best practice" so that he could "reference" the form "in the future if something comes up" and forwarded it to an "outbox" dedicated to *Velesaca* forms. (June 5 Hr'g Tr. 17:3–25; 34:4–18.) Diaz checked "No," in response to the question, "Has the individual established that he/she does not pose a danger to persons or property?" and wrote, "Subject was arrested by Nassau PD on May 4, 2026, and charged with Grand Larceny Property greater value than 1000. Charges are still pending." (Velesaca Form.) Diaz did not answer the questions regarding flight risk. (*See id.*) Diaz marked "Yes" in response to the question, "Have you asked and considered whether the individual has any special vulnerabilities?" and "No," in response to the question, "Have you identified a special vulnerability?" (*Id.*) He marked "Detain" in the section labeled, Initial Custody Determination. (*Id.*) A digital e-signature shows that Diaz signed the form at 7:38 p.m. on May 4, 2026. (*Id.*)

The Notice of Custody Determination states, “You may request a review of this custody determination by an immigration judge,” and Mr. Andradez Materan checked off the boxes stating, “I acknowledge receipt of this notification” and “I do request an immigration judge review of this custody determination.” (Notice of Custody Determination.) Diaz served a copy of the form on Mr. Andradez Materan. When he attempted to upload it to the “ECAS” portal, he received an error message “stating that the subject was already in proceedings and the case was locked” and directing him to “Please notify the EOIR for further instructions.” (Diaz Decl. ¶ 9; June 5 Hr’g Tr. 18:1–7.)

Diaz estimates that Mr. Andradez Materan was at the ICE processing unit for approximately one hour. (June 5 Hr’g Tr. 22:16–17.) Costakis transported Mr. Andradez Materan to the Nassau County Jail at around 8:00 p.m. or 8:15 p.m. (*Id.* 91:1–5.)

## VIII. Transmission of Request for a Bond Hearing in Immigration Court

The Petition was filed on May 27, 2026. (ECF No. 1.) The following day, on May 28, 2026, Diaz received an email from counsel from the Office of the Principal Legal Advisor asking him to re-upload the Notice of Custody Determination Form; Diaz attempted to do so, and received the same error message that he received on May 4, 2026. (June 5 Hr’g Tr. 18:17–25.) Costakis attests in his May 29, 2026 declaration that “[a]t the time of the signing of this declaration, ICE is in the process of forwarding Petitioner’s request to the Immigration Court.” (Costakis Decl. ¶ 18.)

At the June 1, 2026 Show Cause hearing, counsel for Respondents notified the Court that, “as of this morning, the petitioner has been scheduled for his bond hearing with an immigration judge.” (June 1 Hr’g Tr. 8:7–9.) Respondents’ counsel handed Mr. Andradez Materan’s counsel and the Court’s deputy a notice dated June 1, 2026 indicating that Mr. Andradez Materan was

scheduled for a custody redetermination hearing before the immigration court at the Metropolitan Detention Center ("MDC") in Brooklyn on June 9, 2026 at 9:30 a.m. (*Id*. 9:22–23.) Although the notice does not explicitly state so, it appears to schedule a virtual proceeding in light of the identification of the MDC as the hearing location.

### IX. The Show Cause and Evidentiary Hearings Before this Court

Mr. Andradez Materan filed the Petition on May 27, 2026. (ECF No. 1.) Respondents opposed the Petition in a letter response on May 29, 2026 (Letter Resp., ECF No. 10), and a full memorandum in opposition on May 31, 2026 (Mem. Resp., ECF No. 11).[8] Respondents provided the following submissions in support of their responses:

- the declaration of ICE Detention and Deportation Officer Demetrios Costakis ("Costakis Decl.," ECF No. 11-1 at 1–5), attaching the following exhibits:
    - an October 1, 2023 Notice to Appear for an immigration court proceeding on August 20, 2024 (Oct. 1, 2023 NTA, ECF No. 11-1 at 6–8);
    - an October 1, 2023 Order of Release on Recognizance ("OREC," *id*. at 9–10);
    - a March 31, 2025 Certificate of Disposition from the Richmond Criminal Court (*id*. at 11–13);
    - a January 25, 2025 declaration of MTA police officer Darwin Chacon and an accompanying April 22, 2025 Certificate of Disposition from Queens Criminal Court (*id*. at 14–17);
    - a March 13, 2025 declaration of NYPD police officer Melvin Espinoza and an accompanying April 22, 2025 Certificate of Disposition from Queens Criminal Court (*id*. at 18–21);
    - a May 4, 2026 desk appearance ticket for a May 20, 2026 appearance date in Nassau County District Court, First District, Arraignment Part (*id*. at 22–25);

[8] Respondents attached to their initial letter response a declaration from Costakis, as well as accompanying evidentiary submissions. (ECF Nos. 10-1 to 10-9.) When submitting their full memorandum response, Respondents later refiled the same declaration and evidentiary submissions.

    - a summary page of the New York State Unified Court System database for criminal proceedings relating to the May 4, 2026 arrest, indicating a June 9, 2026 arraignment date (*id*. at 26);
    - a May 4, 2026 Form I-200 Warrant for Arrest of Alien (May 4, 2026 Arrest Warrant, *id*. at 27–28); and
    - a May 4, 2026 Notice of Custody Determination (*id*. at 29–30);
- the declaration of ICE Supervisory Detention and Deportation Officer John C. Diaz ("Diaz Decl," ECF No. 11-2).

Mr. Andradez Materan filed a reply in support of his Petition on June 1, 2026. (Reply, ECF No. 12.)

On June 1, 2026, the Court held a Show Cause hearing. (Min. Entry, June 1, 2026.) Upon hearing argument from the parties, the Court concluded that an evidentiary hearing was necessary to resolve the issues raised in the Petition. (*Id.*)

On June 2, 2026, Respondents provided the following supplemental submissions:

- the declaration of Assistant Field Office Director Bryan Flanagan ("Flanagan Decl.," ECF No. 13 at 1–3), attaching the following exhibits:
    - a May 4, 2026 Form I-213 Report of Deportable/Inadmissible Alien (*id.* at 4–8);
    - an October 1, 2023 Form I-213 Report of Deportable/Inadmissible Alien (*id*. at 9–12); and
    - a May 4, 2026 Revocation of an Order of Release on Recognizance ("OREC Revocation," *id*. at 13–14);
- the supplemental declaration of ICE Supervisory Detention and Deportation Officer John C. Diaz ("Supp. Diaz Decl," ECF No. 14), attaching the following exhibit:
    - a May 4, 2026 INA § 236(a) Initial Custody Determination Form pursuant to *Velesaca v. Decker*, No. 20-cv-1803 (S.D.N.Y.) ("Velesaca Form," ECF No. 14 at 3–5) relating to Mr. Andradez Materan.

On June 5, 2026, the Court held an all-day evidentiary hearing. (Min. Entry, June 5, 2026.) The following individuals testified: Mr. Andradez Materan; ICE Assistant Field Office Director Bryan Flanagan; ICE Acting Assistant Field Office Director Tony Petito; and ICE

Detention and Deportation Officers Demetrios Costakis, John C. Diaz, and Dhanraj Totoram. (*Id.*) At the conclusion, the Court ordered Mr. Andradez Materan's release on bail subject to conditions set forth in an Order Setting Conditions of Release. (*Id.*; Sealed Order, ECF No. 17; ECF No. 18.)

The Court permitted the parties to file supplemental briefing on the issues raised in the evidentiary hearing. Respondents filed a supplemental brief on June 22, 2026 (Supp. Resp., ECF No. 19), and Mr. Andradez Materan filed a reply on June 29, 2026. (Supp. Reply, ECF No. 20.)

## DISCUSSION

### I. Exhaustion Does Not Bar Petitioner's Claim

Respondents argue that the Petition should be dismissed because Mr. Andradez Materan has not exhausted administrative remedies by appealing the initial custody determination made by Diaz to an immigration judge and, if necessary, pursuing a further appeal of any denial of release by an immigration judge to the Board of Immigration Appeals. (Mem. Resp. at 4–9 (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19, 1003.38, 1236.1(d)(3)).) On May 4, 2026, Mr. Andradez Materan requested that an immigration judge review his initial custody determination, but Respondents did not actually transmit that request to the Executive Office of Immigration Review until around May 29, 2026, after this Petition was filed. (Costakis Decl. ¶ 18 (noting that ICE was in the process of transmitting the request).[9] It was not until the June 1, 2026 Show

---

[9] Although Officer Diaz contends that he received an error message when he tried to upload Mr. Andradez Materan's request for immigration judge review on May 4, 2026, the record confirms that no one at ICE made any subsequent effort to ensure that Mr. Andradez Materan's request for a bond hearing before an immigration judge was actually filed with the EOIR until May 29, 2026 at the earliest—after the Petition was filed in this Court. (*See* June 5 Hr'g Tr. 18:1–25; 42:19–44:16.)

Cause Hearing before this Court that Respondents' counsel provided a June 1, 2026 notice indicating that the bond hearing was scheduled for June 9, 2026.

Respondents acknowledge that a district court may excuse a petitioner's failure to exhaust administrative remedies under certain circumstances, such as when the available remedies do not provide a genuine opportunity for adequate relief, when there is a risk of irreparable injury absent immediate judicial relief, when an administrative appeal would be futile, or when a petition raises a constitutional question. (Mem. Resp. at 7 (citing *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003), *as amended* (July 24, 2003) (Sotomayor, J.)).) However, they argue that none of these exceptions apply because: (1) a custody redetermination hearing in front of an immigration judge and a subsequent appeal from an adverse decision to the BIA would provide adequate relief; (2) there is no irreparable harm because Mr. Andradez Materan requested immigration court review and, therefore, "jurisdiction lies with the immigration court"; (3) a custody redetermination hearing before an immigration judge would not be futile; and (4) because the existence of a constitutional question does not automatically excuse the exhaustion requirement. (*Id*. at 8–9.)

The Petition alleges that Mr. Andradez Materan was on release subject to the 2023 OREC when he was detained by ICE without notice and an opportunity to be heard in violation of his due process rights. (Pet. ¶¶ 22, 27.) Mr. Andradez Materan contends that this detention violated due process because he "was taken into custody by ICE . . . before any individualized custody determination had been made" and therefore "the asserted custody determination was an after-the-fact ratification of action that had already been taken." (Reply at 2.) He also argues that his OREC was revoked in violation of DHS regulations because neither Costakis, who arrested Mr. Andradez Materan, or Diaz, who conducted the initial custody determination, is an ICE "district

director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign)" as required to authorize the revocation of an order releasing a noncitizen on their own recognizance under 8 C.F.R. § 1236.1(c)(9). (Reply at 2–3.) Thus, this Court understands Mr. Andradez Materan's due process claim to challenge the timing and procedures by which he was detained, which include the procedures relating to his arrest, the revocation of his OREC, and the custody determination.[10]

The Second Circuit has held that habeas petitioners seeking release from immigration detention are "subject . . . to [a] less stringent judicial exhaustion requirement" and are not subject to any statutory requirement to exhaust administrative remedies. *Beharry*, 329 F.3d at 62; *see also J.U. v. Maldonado*, 805 F. Supp. 3d 482, 489 (E.D.N.Y. 2025) ("Courts generally require 'administrative exhaustion before immigration detention may be challenged in federal court by a writ of habeas corpus.'"). Nonetheless, administrative exhaustion may be excused when "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile;

[10] Respondents incorrectly contend that, at the evidentiary hearing, the Court raised "sua sponte and for the first time certain questions with respect to ICE's process and decision to revoke Petitioner's Order of Release on Recognizance." (Resp. Supp. at 1.) The Petition itself attaches a copy of Mr. Andradez Materan's OREC and alleges that ICE detained him without notice and opportunity to be heard. (ECF No. 1-2.) In response, Respondents asserted that detention was justified based on ICE officials' determination that Mr. Andradez Materan had violated the do-not-commit-a-crime condition of the OREC. (*See* Costakis Decl. ¶ 16 (attesting that a warrant was issued "due to Petitioner's violation of his OREC . . . ."); Diaz Decl. ¶ 10 (attesting that ICE detained Mr. Andradez Materan for "violation of his conditions of release").) On reply, Petitioner expressly challenged the "sequence of events" by which ICE deprived Mr. Andradez Materan of his liberty. (Reply at 2.) Thus, Mr. Andradez Materan's due process claims challenge not only whether the ICE officers involved in the revocation of the OREC were authorized to take such action, but also whether the OREC revocation process and its role in the deprivation of his liberty violated his rights to due process.

and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Beharry*, 329 F.3d at 62.

Here, exhaustion is excused for three separate reasons. First, a bond hearing before an immigration judge cannot provide Mr. Andradez Materan the requested relief because, before this Court, he does not challenge the *outcome* of the initial custody determination, but rather, the fact that ICE detained him and revoked his OREC without first providing him an opportunity to be heard on the circumstances of the Nassau County police arrest or any other considerations regarding his risk of flight or dangerousness. A custody redetermination hearing before an immigration judge "is no substitute for the requirement that ICE engage in a 'deliberative process *prior to, or contemporaneous with*,' the initial decision to strip a person of the freedom that lies at the heart of the Due Process Clause." *Chipantiza-Sisalema v. Francis*, No. 25-cv-5528, 2025 WL 1927931, at *3 (S.D.N.Y. Jul. 13, 2025) (emphasis added). As a result, administrative remedies would not provide Mr. Andradez Materan with adequate relief and would therefore be futile.

Second, Respondents' contention that Mr. Andradez Materan did not experience irreparable harm is baseless and contrary to Second Circuit precedent. Mr. Andradez Materan claims that his due process rights were violated because ICE arrested him on the basis of a perceived OREC violation, revoked the OREC, and detained him without any notice and opportunity to be heard. This alleged procedural due process violation "triggers a finding of irreparable injury" that excuses the exhaustion requirement. *Connecticut Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Basank v. Decker*, 613 F. Supp. 3d 776, 788 (S.D.N.Y. 2020) ("In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm.") (collecting cases); *see also Veletanga v. Noemi*, No. 25-cv-9211,

2025 WL 3751865, at *4 (S.D.N.Y. Dec. 26, 2025) ("[C]ourts have easily found irreparable harm where a petitioner is being wrongfully detained.").

Third, because the Petition raises a significant constitutional question relating to Mr. Andradez Materan's procedural due process rights, there is another basis for excusing the exhaustion requirement here. *See Beharry*, 329 F.3d at 62. Accordingly, Mr. Andradez Materan was not required to exhaust any administrative remedies prior to bringing the procedural due process claims set forth in the Petition.

## II. The Court Does not Review Diaz's Initial Custody Determination

In their supplemental briefing, Respondents contend that "the Court is jurisdictionally barred from reviewing ICE's revocation of Petitioner's OREC or custody determination pursuant to 8 U.S.C. § 1226(e)." (Supp. Reply at 2.) Respondents misunderstand Mr. Andradez Materan's Fifth Amendment claim and the due process inquiry conducted by this Court.

8 U.S.C. § 1226(e) ("Section 1226(e)") provides that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." The Second Circuit has recognized that Section 1226(e) does not "limit habeas jurisdiction over constitutional claims or questions of law." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).

"Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Id*. at 851 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). The Fifth Amendment forbids the government from depriving any "person" of liberty without due process of law. U.S. Const. amend. V. Moreover, the Second Circuit has repeatedly recognized that "the Due Process clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at 850; *Barbosa da Cunha*

*v. Freden*, 175 F.4th 61, 94 (2d Cir. 2026) (recognizing that noncitizens subject to ICE detention are "protected by the Fifth Amendment's Due Process Clause"), *cert. granted sub nom. Rhoney v. Barbosa da Cunha*, No. 26-104, 2026 WL 2942994 (U.S. Oct. 1, 2026). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" protected by the Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Thus, "civil commitment for *any* purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979) (emphasis added).

This Court does not review the determination by Flanagan to revoke Mr. Andradez Materan's OREC or the decision by Diaz to deny Mr. Andradez Materan release on bond. Rather, this Court's role is to evaluate whether the procedures ICE used to detain Mr. Andradez Materan—specifically, the timing and manner with which it deprived him of his liberty, revoked his OREC, and performed a custody determination—violated his rights to procedural due process. This inquiry falls squarely within the scope of standard due process analysis and is not barred by Section 1226(e). *See, e.g.*, *Giron v. Warden Metro. Det. Ctr. Brook.*, No. 26-cv-5497, 2026 WL 3015684, at *3 (E.D.N.Y. Oct. 7, 2026) ("Of course, Section 1226(e) does not bar the Court from 'assess[ing] whether and how correct procedures were applied at all . . . and ultimately, whether [Petitioner]'s detention comports with due process.'").

## III. Respondents Violated Petitioner's Right to Procedural Due Process

The Due Process Clause of the Fifth Amendment provides that "[n]o person . . . shall be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. Its protections apply to "noncitizens . . . whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at 850. Moreover, "[t]he Supreme Court has been

unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Id*.

To satisfy due process, the procedures afforded must be "appropriate to the nature of the case *before* the termination [of a constitutionally protected interest] becomes effective." *Bell v. Burson*, 402 U.S. 535, 542 (1971) (emphasis added). Here, it is undisputed that ICE detained Mr. Andradez Materan pursuant to 8 U.S.C. § 1226(a). (Letter Resp. at 1; Mem. Resp. at 10; Supp. Reply at 1.) Section 1226(a) provides that the Attorney General—or his designated officers—may "detain" or "release" a noncitizen, pending a decision on whether the noncitizen is to be removed from the United States. 8 U.S.C. § 1226(a). "This language undoubtedly vests broad authority to arrest and detain . . . but due process must account for the wide discretion . . . to arrest *any* person in the United States suspected of being removable." *Lopez Benitez v. Francis*, 795 F. Supp. 3d 474, 492 (S.D.N.Y. 2025) (quotations omitted) (emphasis in original). Moreover, civil immigration detention must be "nonpunitive in purpose" and bear a "reasonable relation" to the authorized statutory purpose of preventing flight and danger to the community. *Zadvydas*, 533 U.S. at 690 (2001); *see also Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 317 (E.D.N.Y. 2025).

Mr. Andradez Materan has a liberty interest in being free from detention, which was infringed when ICE detained him starting on May 4, 2026. "The government's decision to release an individual from custody creates an implicit promise, upon which that individual may rely, that their liberty will be revoked only if they fail to live up to the conditions of release." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). Thus, when USBP released Mr. Andradez Materan on his own recognizance pursuant to the OREC in 2023, "it conferred a conditional liberty interest that may not be withdrawn without constitutionally sufficient process." *Singh v.*

*Janecka*, No. 5:26-cv-01466, 2026 WL 1334832, at *2 (C.D. Cal. May 8, 2026). The infringement of Mr. Andradez Materan's protected liberty interest triggers a right to due process.

Courts apply the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976), to determine "whether [a habeas petitioner's] ongoing incarceration posed due process concerns at the time of [their] habeas filing and whether additional procedural protections then [become] necessary." *Velasco Lopez*, 978 F.3d at 851; *see also Black v. Decker*, 103 F.4th 133, 150–51 (2d Cir. 2024) (holding that courts must engage in a "flexible due process analysis" to "determine, case by case, whether and when due process requires that a particular detained noncitizen receive a bond hearing"); *Munoz Materano v. Artera*, 804 F. Supp. 3d 395, 416 (S.D.N.Y. Sept. 12, 2025) (applying *Mathews* to "determin[e] the adequacy of process in the context of civil immigration confinement"). Under this test, a court must consider: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the fiscal and administrative burdens that any additional or substitute procedures would entail. *Mathews*, 424 U.S. at 321.

Mr. Andradez Materan argues that the *Mathews* factors weigh in his favor in light of, among other things, the severe impact of detention on himself and his family and the lack of any opportunity to be heard on the issues of flight risk and dangerousness before either his arrest or the revocation of the OREC. (*See* Reply, ECF No. 12; Supp. Reply, ECF No. 20.) Respondents fail to address any of the *Mathews* factors in any of their submissions to the Court and instead argue that ICE properly revoked Mr. Andradez Materan's OREC and conducted an initial custody determination. (*See* Letter Resp.; Mem. Resp.; Supp. Resp.)

Applying the *Mathews* balancing test to the facts before this Court, Respondents' detention of Mr. Andradez Materan violated his Fifth Amendment rights to procedural due process. The first *Mathews* factor weighs heavily in favor of Mr. Andradez Materan because ICE's detention of him without any pre-deprivation notice or opportunity to be heard infringes on "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851. The second *Mathews* factor also weighs in his favor because ICE's failure to comply with its own regulations governing the revocation of release and the lack of any opportunity for Mr. Andradez Materan to be heard on the circumstances of the grand larceny arrest and the related issues of flight risk and dangerousness before Flanagan revoked the 2023 OREC create a high risk of erroneous deprivation. With respect to the third *Mathews* factor, although the government has a legitimate interest in promoting appearance at immigration court proceedings and public safety, Respondents have not shown that either interest was advanced by denying Mr. Andradez Materan an opportunity to be heard before his OREC was revoked and he was detained pursuant to that decision.

a. <u>Liberty Interest</u>

Mr. Andradez Materan's profound interest in being free from physical detention is obvious. *See Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."). Here, ICE's detention of Mr. Andradez Materan for 32 days, until this Court ordered his release on bail, constituted a significant deprivation of his liberty interest in remaining free from detention. As direct consequences of that deprivation, Mr.

Andradez Materan was separated from his young child and wife and prevented from fulfilling his role as their sole financial provider. (*See* June 5 Hr'g Tr. 133:14–18.)

The consequences of the deprivation of Mr. Andradez Materan's liberty are particularly acute because ICE detention threatens to impair his ability to defend himself against the state charge on which ICE relied to detain him. Nassau County police issued Mr. Andradez Materan a desk appearance ticket accusing him of grand larceny in the fourth degree and requiring him to appear in the Nassau County, First District Court, Arraignment Part in Hempstead, New York on May 20, 2026, at 9:00 a.m., which was later adjourned to Tuesday, June 9, 2026. (June 5 Hr'g Tr. 168:18–23; Desk Appearance Ticket, ECF No. 11-1 at 22–25.) However, the record reflects that Mr. Andradez Materan was also scheduled to appear virtually before the immigration court from the MDC in Brooklyn for his master calendar hearing and bond hearing on Tuesday, June 9, 2026 at 9:30 a.m.—just thirty minutes after the commencement of his criminal proceeding in Long Island. (Costakis Decl. ¶ 10; June 1 Hr'g Tr. 8:7–9, 9:22–23.) Respondents failed to notice this conflict and the impossibility of appearing in two places at the same time until this Court brought it to their attention during the Friday, June 5, 2026 evidentiary hearing in this action. (June 5 Hr'g Tr. 163:4–167:6.) While Respondents asserted that it would be "possible" to seek an adjournment of both court proceedings, they do not dispute that they were unaware of the conflict until this Court raised it and that they had made no effort to try to reschedule either the immigration court or criminal court proceeding on Mr. Andradez Materan's behalf. (*Id.* 164:22–165:1.)

Compounding this problem is the undisputed fact that, in the weeks after his arrest on May 4, 2026, Mr. Andradez Materan had no access to counsel in either court to request an adjournment. Prior to the master calendar hearing, he had no access to immigration counsel who

could request an adjournment of the master calendar hearing and bond redetermination in immigration court on his behalf. (*Id*. 191:16–22.) Nor did he have access to criminal defense counsel as an ICE detainee facing a desk appearance ticket accusing him of grand larceny in the fourth degree. Although a "defendant has a right to the aid of counsel at the arraignment and at every subsequent stage of the action," N.Y. Crim. Proc. Law § 180.10 (McKinney), a defendant facing a desk appearance ticket is not screened or appointed counsel until their first appearance in court. In a related action before this Court, Mr. Andradez Materan's counsel—an experienced practitioner in New York criminal courts—explained that a defendant must appear for an arraignment on a desk appearance ticket to be screened for indigence and court-appointment of counsel. *See Martinez Adauto v. Maldonado et al.*, No. 2:26-cv-03784 (E.D.N.Y.), June 29, 2026 Hr'g Tr. 10:1–12, 38:1–11 (where Mr. Andradez Materan's counsel, an experienced New York criminal court practitioner confirmed that a defendant issued a desk appearance ticket is not screened for indigence and court-appointment of counsel until their first appearance in court).

Thus, while in ICE detention, Mr. Andradez Materan was faced with the impossible requirement to appear before two courts in different counties for two critically important proceedings on the same date and at almost exactly the same time, with no effort by Respondents to ensure that he was not penalized for failure to appear at either proceeding and no access to counsel in either court to assist him in seeking an adjournment or other appropriate relief. Such conflicts are challenging even for individuals who are free in the community. But they are particularly acute for people in detention, who have limited means of communicating with the outside world.

Indeed, ICE has failed to produce habeas petitioners for their criminal court proceedings. Such was the case with respect to Mr. Martinez Adauto, who was arrested alongside Mr.

Andradez Materan on May 4, 2026. Like Mr. Andradez Materan, Mr. Martinez Adauto was required to appear in Nassau County District Court on June 9, 2026 to answer on a desk appearance ticket for grand larceny in the fourth degree. *Martinez Adauto v. Maldonado et al.*, No. 2:26-cv-03784 (E.D.N.Y.), June 29, 2026 Hr'g Tr. 10:16–19. Diaz testified that he was aware of Mr. Martinez Adauto's desk appearance ticket. *Id.* 65:14–24, 70:14–20. However, Diaz made no inquiry into Mr. Martinez Adauto's court date and testified that neither he, nor anyone else at ICE of whom he was aware, made any effort to inform the district attorney's office that Mr. Martinez Adauto was in ICE custody. *Id.* 67:4–68:3, 70:25–71:4. Similarly, Costakis handled the desk appearance ticket and read it to determine which charges to enter into ICE's databases, but did not look at the date of Mr. Martinez Adauto's first appearance in criminal court or make any effort to ensure that he was brought to court. *Id.* 85:22–87:12. Costakis also testified that his supervisor did not ask him for any information regarding Mr. Martinez Adauto's criminal court date and that he was not aware of anyone at ICE who would follow up on the court dates of detained persons to help ensure that they were produced to court. *Id.* 87:13–15, 88:3–8. As a result of ICE's failure to notify the district attorney, ICE did not receive a writ of habeas corpus ad prosequendum, which would have required ICE to produce Mr. Martinez Adauto for his criminal hearing on June 9, 2026. *Id*. at 15:20–16:6, 36:17–19. Mr. Martinez Adauto  failed to appear in criminal court as required and was not screened for court-appointed counsel or assigned counsel, and a bench warrant was issued for his arrest. June 29, 2026 Hr'g Tr. at 9:11–10:25, 36:24–37:10; *see also Martinez Adauto v. Maldonado et al.*, No. 2:26-cv-03784, ECF. No. 9-1.

The factual context thus underscores the significance of the liberty deprivation at issue with respect to Mr. Andradez Materan's due process claims. While Mr. Andradez Materan was

detained in ICE custody, he lacked access to counsel in criminal court and immigration court and faced competing obligations to appear before these courts at the same time for critical proceedings—a bond hearing before the immigration court and an initial appearance on the grand larceny accusation—with no effort by Respondents to ensure that he would be produced for these proceedings or could otherwise seek an adjournment lest he face adverse consequences for failure to appear.

For all of these reasons, particularly heavy weight is afforded to the first *Mathews* prong. Moreover, the Court acknowledges that Mr. Andradez Materan was detained for 32 days at the time that it ordered his release on bond. Nevertheless, the circumstances here still warrant a finding that a significant private interest is at issue.

b. Risk of Erroneous Deprivation

Here, ICE's failure to follow its own regulations in detaining Mr. Andradez Materan and the complete lack of any notice or opportunity for him to be heard before being deprived of his liberty gives rise to a significant risk of erroneous deprivation.

Mr. Andradez Materan was initially arrested by Nassau County police officers who did not speak Spanish and with whom he could not communicate to explain the circumstances of his arrest. *See* Factual Background Section III *supra*. That arrest formed the basis of Diaz's initial decision to arrest and detain Mr. Andradez Materan, as well as Flanagan's later decision to revoke his OREC, which occurred around one hour *before* any DHS or ICE officer had any conversation with Mr. Andradez Materan to determine risk of flight or dangerousness. *See id.* Section IV–VIII *supra*. Flanagan made the decision to revoke the OREC during a phone call that lasted, by both his and Diaz's accounts, "probably under a minute," and that focused on Mr. Andradez Materan's immigration history and arrest earlier that day for grand larceny in the

fourth degree. *See id*. Section VI *supra*. While Diaz testified that he gave Flanagan a "quick synopsis" of Mr. Andradez Materan's criminal and immigration history, Flanagan acknowledged that the information relayed did not include Mr. Andradez Materan's "full criminal history." (*See* June 5 Hr'g Tr. 38:6–9; 65:16–18.) Mr. Andradez Materan was not given any chance to address the conduct that resulted in the grand larceny arrest—whether before he was arrested or before his OREC was revoked. *See id*. Section VI–VII *supra*. Rather, after the OREC was revoked, Diaz determined that Mr. Andradez Materan should be detained and offered him an opportunity to request review of that determination by an immigration judge, only to then fail to submit the request to the Executive Office for Immigration Review for 25 days until after the Petition in this action was filed. *See* Factual Background Section IX *supra.*

These procedures create a substantial risk of erroneous deprivation. The initial decision to arrest Mr. Andradez Materan was made by Diaz—an ICE officer who lacked the required statutory authority to revoke release. Nor do Respondents show that Flanagan was authorized to revoke the OREC. Moreover, the OREC revocation decision was cursory and predetermined the result of Diaz's custody determination, which took place around one hour or so later. As a result, no DHS or ICE officer provided Mr. Andradez Materan any notice and opportunity to be heard before his detention or the formal revocation of his OREC. Nor did any DHS or ICE officer make any individualized determination as to whether Mr. Andradez Materan posed a risk of flight or dangerousness either before or contemporaneous with his arrest and detention. Both issues create a significant risk of erroneous deprivation.

***i. Section 1226(a) Statutory Framework***

Section 1226(a) permits the arrest and detention of a noncitizen pending ongoing removal proceedings. 8 U.S.C. § 1226(a). However, when ICE seeks to exercise its discretion to detain a

noncitizen under Section 1226(a), the statute and its implementing regulations require ICE to first make an individualized custody determination.

Section 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis added). The statute specifies that, pending a removal decision, the Attorney General "*may* continue to detain the arrested alien" or "*may* release the alien on bond" or on "conditional parole." *Id.* § 1226(a)(1)–(2) (emphasis added). As other district courts have recognized, "[t]he Supreme Court has interpreted similar 'may' language in other provisions of the INA to require the Attorney General to make 'some level of individualized determination.'" *Velesaca v. Decker*, 458 F. Supp. 3d 224, 235 (S.D.N.Y. 2020) (quoting *I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 194 (1991)); *see also Hyppolite v. Noem*, 808 F. Supp. 3d 474, 485 (E.D.N.Y. 2025) (characterizing Section 1226(a) as "a *discretionary* detention provision" requiring "an individualized bond determination before a noncitizen may be taken into custody" (emphasis in original)). Section 1226(a)'s implementing regulations also contemplate that a DHS officer will conduct an "*initial* custody determination," after which a noncitizen may request review of that decision by an immigration judge. 8 C.F.R. § 236.1(d)(1) (emphasis added). As such, the plain language of Section 1226(a) and its associated regulations require the provision of an individualized custody determination with respect to any noncitizen detained under the statute.

Section 1226(a)'s implementing regulations further specify the nature of the individualized inquiry that must be provided to the noncitizen. A DHS officer may grant a noncitizen bond or conditional parole pending a final decision in the noncitizen's removal proceedings "provided that the alien must demonstrate to the satisfaction of the officer that such

release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. §§ 236.1(c)(8), 1236.1(c)(8). This regulation contemplates that the noncitizen will be provided an opportunity to be heard *before* detention, because it provides that the noncitizen "must demonstrate to the satisfaction of the officer" that release on bond or parole will not pose a public safety or flight risk. *Id.*; *see also Kelly v. Almodovar*, No. 25-cv-6448, 2025 WL 2381591, at *3 (S.D.N.Y. Aug. 15, 2025) (finding a due process violation where ICE did not allow the petitioner "to make his case" before being detained (citing 8 C.F.R. §§ 1236.1(c)(8); 236.1(c)(8)). When a DHS officer decides to detain a noncitizen under Section 1226(a) after conducting an individualized inquiry into flight risk and danger, the noncitizen may appeal the custody determination to an immigration judge, who must conduct that inquiry anew. *See* 8 C.F.R. §§ 1003.19(a), (d), (e); *Lopez Benitez*, 795 F. Supp. 3d at 492–93 ("If DHS ultimately decides to detain a noncitizen after conducting such an assessment, that noncitizen may appeal said decision before an immigration judge, who must consider the same factors." (citing 8 C.F.R. §§ 1003.19(d), (e))). The noncitizen also has a right to appeal the immigration judge's decision to the Board of Immigration Appeals. *See* 8 C.F.R. § 1003.19(f).

Accordingly, in exercising discretionary authority to detain a noncitizen under Section 1226(a), ICE must conduct an individualized inquiry into whether the noncitizen presents a flight risk or danger to persons or property, provide the noncitizen an opportunity to be heard *before* it makes the custody determination, and afford an appeal of the initial custody determination to an immigration judge. *See, e.g.*, *Chipantiza-Sisalema*, 2025 WL 1927931, at *3 (holding that "if ICE wishes to detain a noncitizen under the detention authority provided by 8 U.S.C. § 1226(a), ICE must allow the noncitizen" an opportunity to "demonstrate to the satisfaction of the officer that release would not pose a danger to property or persons, and that the noncitizen is likely to

appear for any future proceeding" (brackets omitted) (quoting 8 C.F.R. §§ 1236.1(c)(8), 236.1(c)(8))); *Curimilma Quille v. Blanche*, No. 26-cv-2818, 2026 WL 1453889, at *3 (E.D.N.Y. May 22, 2026) ("In practice, [Section 1226(a)] affords Petitioner 'an initial custody determination *before* exercising discretionary detention that entails an assessment of whether he can demonstrate that he is neither a danger to persons or property, nor a flight risk.'" (emphasis in original)); *Pastrana-Beltran v. Mullin*, No. 26-cv-2657, 2026 WL 1398609, at *2 (E.D.N.Y. May 19, 2026) ("[S]ection 1226(a) affords [the petitioner] an initial custody determination before exercising discretionary detention that entails an assessment of whether he can demonstrate that he is neither a danger to persons or property, nor a flight risk.").

***ii. Procedural Defects in OREC Revocation and Custody Determination Process***

*1. Authority to Revoke ROR*

As an initial matter, Respondents fail to show that Mr. Andradez Materan's OREC was ever revoked by the proper ICE official. 8 C.F.R. § 236.1(c)(9), which governs revocations of ORECs, provides:

> When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the *district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign)*, in which event the alien may be taken into physical custody and detained.

8 C.F.R. § 236.1(c)(9) (emphasis added) ("Section 236.1(c)(9)"). Additionally, 8 C.F.R. § 1.2 defines "Director or district director" as follows:

> [P]rior to March 1, 2003, means the district director or regional service center director, unless otherwise specified. On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. The terms also mean such other official, including an official in an acting capacity, within U.S.

> Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, or other component of the Department of Homeland Security who is delegated the function or authority above for a particular geographic district, region, or area.

8 C.F.R. § 1.2.

Here, after learning that Mr. Andradez Materan had been arrested by Nassau County police, Supervisory Detention and Deportation Officer Diaz concluded that he violated the OREC and issued an arrest warrant, which Costakis and Vrahnas then used to arrest Mr. Andradez Materan. However, Supervisory Deportation and Detention Officers are not included in the list of officials authorized by regulation to revoke the release of a noncitizen under 8 C.F.R. § 236.1(c)(9) and 8 C.F.R. § 1.2.

Additionally, Respondents also fail to show that Flanagan, who ultimately did revoke Mr. Andradez Materan's OREC, was authorized to do so. They maintain that New York Field Office Director Kenneth Genalo delegated the authority to revoke ORECs to all AFODs in the New York Field Office in a March 18, 2026 email. (June 5 Hr'g Tr. 77:22–78:18.) However, despite providing numerous supplemental evidentiary and legal submissions in this case, Respondents failed to submit the referenced March 2026 email. AFOD Flanagan testified unconvincingly that he recalled receiving an email from "a mailbox . . . on behalf of the Field Office Director" that was sent to "AFODs within the New York Field Office," which conveyed that Genalo was "delegating his authority for . . . AFODs to revoke Order of Releases on Recognizance," though he could not recall whether the delegation was for a specified duration of time. (*Id.* 78:10–79:15.) This testimony was lacking credibility based both on its vagueness and Flanagan's demeanor before this Court.

Respondents also assert that Flanagan holds a position that corresponds with one identified in Section 236.1(c)(9) as authorized to revoke an OREC. According to Flanagan, the

officer titles enumerated in 8 C.F.R. § 236.1(c)(9) are "legacy INS titles" which are no longer in use at ICE, and his current title corresponds with "the assistant director of *either* investigations, examinations *or* detention and deportation." (June 5 Hr'g Tr. 84:5–15 (emphasis added).) Flanagan thus identified three *potential* titles to which his own position corresponds, but did not confirm that his role is the equivalent of any single position identified in 8 C.F.R. § 236.1(c)(9). He also acknowledged that there was no document translating any of the "legacy INS titles" to his current title. (*Id*. 61:2–5.) This testimony is unconvincing, and Respondents failed to provide any records supporting it despite their production of sequential evidentiary submissions and post-hearing briefing.[11]

*2. Duration and Sequence of Events*

Next, the order of ICE's operations with respect to its arrest and detention of Mr. Andradez Materan violated applicable regulations governing the revocation of release and create a substantial risk of erroneous deprivation.

The deprivation of Mr. Andradez Materan's liberty was initiated by Diaz, who concluded that he had violated the do-not-commit-a-crime condition of the 2023 OREC, generated an administrative arrest warrant, and instructed Costakis and Vrahnas to arrest Mr. Andradez Materan. (June 5 Hr'g Tr. 32:1–3.) Only after taking those steps did Diaz call Flanagan and ask him to revoke Mr. Andradez Materan's release pursuant to the OREC. Flanagan did so in a brief phone conversation with Diaz that lasted "probably under a minute" and focused almost exclusively on Mr. Andradez Materan's immigration history and recent Nassau County arrest for grand larceny in the fourth degree. (June 5 Hr'g Tr. 37:23–38:9; 59:14–17; 65:9–15.) Testimony

[11] For example, as noted above, Respondents appeared in Court on June 1, 2026 with a notice scheduling a bond redetermination hearing that had been issued that day.

by Flanagan and Diaz confirm that during their perfunctory conversation, Flanagan did not actually consider whether the facts presented to him showed that Mr. Andradez Materan posed a risk of flight or dangerousness. *See* June 5 Hr'g Tr. 37:23–38:3; 74:9–11. Finally, Diaz did not conduct the custody determination interview of Mr. Andradez Materan until at around 7:49 p.m.—around two hours after he had already issued a warrant and instructed ICE officers to arrest Mr. Andradez Materan and around an hour or so after Flanagan revoked the OREC.

The order of events makes clear that Flanagan revoked Mr. Andradez Materan's OREC only *after* Diaz had already generated an arrest warrant and dispatched officers to conduct the arrest and after those officers had arrested Mr. Andradez Materan, thereby depriving him of his liberty. But these procedures are squarely contrary to 8 C.F.R. § 236.1(c)(9) ("Section 236.1(c)(9)") which implements Section 1226(a). This regulation provides:

> When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), *in which event* the alien may be taken into physical custody and detained.

8 C.F.R. § 236.1(c)(9) (emphasis added). Section 236.1(c)(9) plainly contemplates revocation *before* a noncitizen who is on release "may be taken into physical custody and detained." *Id*. Yet, ICE officers took Mr. Andradez Materan into physical custody and detained him before Flanagan revoked the OREC.

Moreover, evidence in the record points to the conclusion that the custody determination conducted by Diaz at around 7:49 p.m. was a pro forma exercise with a predetermined end that simply reiterated the conclusion of the cursory OREC revocation procedure: that Mr. Andradez Materan would be detained pending removal proceedings. Such post-hoc and pro forma procedures fail to guard against the substantial risk of erroneous deprivation from such cursory

OREC revocation procedures. *See Villatoro v. Mullin*, No. 5:26-cv-04488, 2026 WL 2507725, at *9 (C.D. Cal. Aug. 25, 2026) (finding that a post-deprivation bond hearing following revocation of an OREC was not a constitutionally adequate safeguard against a high risk of erroneous deprivation).

Respondents' contention that this post-hoc custody determination afforded Mr. Andradez Materan due process is contradicted by the record. Neither Diaz nor Flanagan provided Mr. Andradez Materan with any opportunity to be heard about the facts related to the arrest for grand larceny in the fourth degree or the related issues of whether he posed any risk of flight or

dangerousness *before* Mr. Andradez Materan was arrested and detained or *before* Flanagan revoked the OREC. Flanagan testified:

Q: Did you speak directly to Mr. Andradez Materan?

Flanagan: No, Your Honor.

Q: Did you give him the opportunity to talk to you before you made the determination to revoke the OREC?

Flanagan: No, Your Honor."

(June 5 Hr'g Tr. 66:1–7.) Moreover, Diaz confirmed that the decision to detain Mr. Andradez Materan was made before his custody determination interview:

Q: So 6:22 p.m., the decision had been made by Director Flannagan, right?

Diaz: Yes.

Q: Okay. And so by that time, it was clear he was going to be detained?

Diaz: Yes.

Q: Okay. And just to be – just to be clear, that was before the conversation that you've described in which you asked him certain questions?

Diaz: Yes, the person was not in front of me at the time.

(*Id*. 28:11–21.) Such procedures create a high risk of deprivation even where a noncitizen does not pose a risk of flight or dangerousness.

Moreover, although Diaz and Costakis checked various ICE databases for records relating to Mr. Andradez Materan before Diaz generated the arrest warrant, Respondents fail to show that Flanagan considered any of the information gleaned from these record checks in deciding to revoke the OREC during a phone call with Diaz that lasted "probably under a minute." (June 5 Hr'g Tr. 37:23–38:3; 74:9–11.) Rather, Flanagan testified that he did not have access to Mr. Andradez Materan's "full criminal history" at the time he decided to revoke the

OREC. (*Id.* 65:16–18.) He explained, "I would say it's after hours and I was, you know, relying on the information, and the database checks that are run by the processing and arresting officers, and that information being relayed to the supervisor and in turn, being relayed to me." (*Id.* 75:12–17.) In light of the brevity of his call with Diaz, it is implausible that Flanagan gleaned much information about Mr. Andradez Materan during the call. Moreover, even had Flanagan learned about any of Mr. Andradez Materan's prior arrests from Diaz during the brief call, "the mere 'review' of a RAP sheet is not tantamount to an individualized assessment of a suspect's flight risk or dangerousness." *Kelly*, 2025 WL 2381591, at *3.[12]

Accordingly, based on all of the evidence in the record, the procedures used to deprive Mr. Andradez Materan of his liberty as an individual on release pursuant to an OREC create a significant risk of erroneous deprivation.

c. Government Interest

Because Respondents fail to address any of the *Mathews* factors, they also fail to identify any government interests advanced by ICE's detention of Mr. Andradez Materan based on the revocation of his OREC without any opportunity to be heard on whether he violated a release condition or otherwise presented a risk of flight or danger. Mr. Andradez Materan's May 4, 2026 arrest for grand larceny in the fourth degree does not involve violence and was handled through the issuance of a desk appearance ticket—not pre-trial detention. Moreover, Mr. Andradez Materan vigorously disputes that he stole the forklift equipment at issue, although he cannot challenge the accusation against him until he first appears in criminal court. As of the June 5, 2026 evidentiary hearing before this Court, Mr. Andradez Materan had no such opportunity

[12] Based on this Court's review of Mr. Andradez Materan's records, all of the charges against Mr. Andradez Materan were dismissed or reduced to lesser offenses carrying no more than 15 days of imprisonment. (ECF Nos. 11-1 at 11–21.)

although more than one month had passed since he was issued the desk appearance ticket. Respondents also point to Mr. Andradez Materan's record of prior arrests, but at least two of the charges underlying those arrests were dismissed, while at least four were resolved by conditional discharge, without any period of incarceration. (ECF Nos. 11-1 at 11–21.)

Although the government has a legitimate interest in guarding against flight risk by noncitizens subject to removal proceedings and in protecting the public from danger, Respondents entirely fail to show that detaining Mr. Andradez Materan without providing him an opportunity to be heard on whether he violated a release condition or otherwise presented a risk of danger or flight advanced either of these interests. "[T]he Government's interest in re-detaining non-citizens previously released without a hearing is 'minimal[.]'" *Tesara v. Wamsley*, No. c25-1723, 2025 WL 3288295, at *6 (W.D. Wash. Nov. 25, 2025); *see also Villatoro*, 2026 WL 2507725, at *9 ("Though the government has an interest in the steady enforcement of its immigration laws, the government's interest in detaining Petitioner without any procedural protections is slight."); *Pineda*, 2026 WL 25510, at *6 (same). Moreover, "[i]f a neutral arbitrator finds that re-detention is not legally justified, a pre-deprivation hearing will save Respondents from spending resources on erroneous detention." *Rodriguez Diaz*, 2025 WL 3011852, at *13.

* * *

Accordingly, balancing the *Mathews* factors in this case, ICE's arrest and detention of Mr. Andradez Materan violated his Fifth Amendment right to procedural due process because it was based first on Diaz's determination that Mr. Andradez Materan violated a release condition based almost entirely on the arrest for grand larceny in the fourth degree and then on Flanagan's cursory revocation of the OREC, without any pre-deprivation notice or opportunity to be heard

on the accusation that he violated a release condition. Not only did ICE fail to follow its own regulations limiting the officials authorized to revoke release and requiring that revocation of release precede—not follow—the deprivation of a released person's liberty, ICE's perfunctory OREC revocation procedures failed to provide Mr. Andradez Materan any chance to be heard, and the pro forma and predetermined custody determination conducted around one hour later was no cure. Such procedures create a grave risk of erroneous deprivation of liberty without advancing any legitimate government interest in ensuring appearance at removal proceedings or protecting the public from danger. *See Villatoro*, 2026 WL 2507725, at *9 (finding that a bond hearing following revocation of an OREC was not a constitutionally adequate safeguard against a high risk of erroneous deprivation); *Herrera Gomez v. Wamsley*, No. 2:25-cv-02642, 2026 WL 279966, at *3 (W.D. Wash. Feb. 3, 2026) (concluding that "the revocation of an OREC requires a pre-deprivation hearing to determine if that noncitizen is a flight risk or danger to the community"); *see also id*. (collecting cases); *see Pineda v. Chestnut*, No. 1:25-cv-01970, 2026 WL 25510, at *5 (E.D. Cal. Jan. 5, 2026) ("Although Respondents allege . . . that Petitioner repeatedly violated the terms of her release . . . no neutral arbiter has determined whether those facts show that Petitioner is a flight risk or danger to the community.").

In their supplemental briefing, Respondents rely on a handful of cases to argue that Mr. Andradez Materan's Nassau County arrest constituted a valid basis for revocation of the OREC and that there is no requirement for a pre-deprivation opportunity to be heard concerning such a revocation of release. None of these cases stand for the propositions that Respondents advance.

First, Respondents rely on *Villiers v. Decker*, 31 F.4th 825, 827 (2d Cir. 2022), but misread its holding. In *Villiers*, the district court had ordered the release of a habeas petitioner on the condition that he not commit any crime while on release and "restrained ICE from rearresting

[the petitioner] for immigration detention without court permission." *Id* at 828, 833. When ICE sought revocation of release based on an arrest and related criminal charges, the district court denied the request ruling, "as a matter of law that a release condition prohibiting the commission of a crime is not violated unless and until there is a conviction." *Id*. at 831. The Second Circuit vacated that legal ruling, holding that the district court should not wait for the criminal process to conclude, but should determine whether the do-not-commit-a-crime condition was violated by resolving whether Villiers "more likely than not committed the acts alleged." *Id*. at 835, 837. Pertinent to the due process claim here, the Second Circuit confirmed that Villiers had a right to an opportunity to be heard *before* the district court ruled on the request to revoke release: "Villiers is entitled, if he requests, to an evidentiary hearing and an opportunity to be heard on the charge that his acts violated the [sic] that condition." *Id*. at 837. Thus, Villers supports Mr. Andradez Materan, who argues that he was entitled to an opportunity to be heard on the facts surrounding the grand larceny arrest before being detained on the basis of an OREC violation. Mr. Andradez Materan does not argue—and this Court does *not* hold—that the conduct underlying an arrest can *never* form the basis for revoking the do-not-commit-a-crime condition of an order or release. Rather, this Court follows the principle set forth in *Villiers*, that an individual on release is entitled to an opportunity to be heard on whether their conduct violated the do-not-commit-a-crime condition of release before release is revoked.

Second, Respondents seek to distinguish two cases cited by the Court in its order releasing Mr. Andradez Materan on bail subject to conditions of release. (Supp. Resp. at 7–8.) Respondents argue that *Aslan v. Wamsley*, No. 2:25-cv-2698, 2026 WL 238675, at *1 (W.D. Wash. Jan. 29, 2026), is not pertinent because in that case there was an "evidentiary" gap requiring a neutral arbiter to assess the government's factual assertions before the revocation of

release. In *Aslan*, the government relied upon a missed ICE check-in as the basis for revoking a noncitizen's release from detention. *Id*. Although it was undisputed that the petitioner missed the ICE appointment at issue, the petitioner disputed that he had received notice of it and that his failure to appear indicated a risk of flight. *Id*. at *3. Here, there is a similar evidentiary gap. Mr. Andradez Materan does not dispute that he was arrested for grand larceny in the fourth degree on May 4, 2026, but he disputes what happened that led to the arrest and whether these facts show that he violated the do-not-commit-a-crime condition of his release. (Supp. Reply at 2.) He maintains that, due to a language barrier, the arresting officers did not understand his efforts to explain that the forklift parts that he was alleged to have taken were lying on the side of a road, in front of a garbage can and that he believed they were abandoned. (June 5 Hr'g Tr. 131:20–132:4; 136:25–4; 146:12–19.) This dispute is precisely the type of "evidentiary gap" that, at a minimum, required Mr. Andradez Materan to be afforded an opportunity to be heard *before* the revocation of his release on the OREC, which did not happen here.[13]

Third, Respondents attempt to distinguish *Rodriguez Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 3011852, at *10–13 (N.D. Cal. Sept. 16, 2025), where a court found there to be a high risk of erroneous deprivation where ICE sought to re-detain a noncitizen released on bond without a pre-deprivation hearing. Here, Respondents argue that Mr. Andradez Materan "was

[13] Respondents argue that the *Aslan* court "conflate[d] the revocation of an OREC with the custody determination required by § 1226." (Supp Br. at 7.) To the extent that Respondents imply that the process that is due may differ when a noncitizen is arrested and detained in relation to an OREC violation as opposed to when a noncitizen who is not subject to an OREC is arrested pursuant to Section 1226(a), they fail to show how such a distinction is material with respect to Mr. Andradez Materan. As addressed above, Mr. Andradez Materan was not afforded any opportunity to be heard as to whether the circumstances surrounding the Nassau County arrest constituted a violation of the do-not-commit-a-crime condition of the OREC whether before he was arrested in the Fourth Precinct or before Flanagan revoked his OREC.

given the opportunity to challenge his custody determination at a bond hearing before an immigration judge." (Supp. Resp. at 8.) As recognized in *Rodriguez Diaz*, the revocation of an OREC is not subject to review in a bond redetermination hearing in immigration court. Thus, Mr. Andradez Materan would indeed have "no pathway to challenge" his detention without notice and an opportunity to be heard as a result of the revocation of the OREC in immigration court even at a bond redetermination hearing. 2025 WL 3011852, at *11. Moreover, it remains worth noting that although Mr. Andradez Materan requested a bond redetermination hearing on May 4, 2026, ICE failed to ensure that this request was submitted until *after* this Petition was filed. Indeed, it was not until this Court held a Show Cause hearing on June 1, 2026, that counsel for Respondents appeared in Court with a hard copy of a notice indicating that a bond redetermination hearing had been scheduled for June 9, 2026, at 9:30 a.m.—the same date and time as Mr. Andradez Materan's first appearance in Nassau County District Court to answer on the desk appearance ticket accusing him of grand larceny in the fourth degree. (June 1 Hr'g Tr. 8:7–9; 9:22–23.)[14]

[14] Accordingly, Respondents' contention in their supplemental reply that "[a]lthough a bond hearing had been scheduled, it was mooted out after the June 6 hearing where the Court released Petitioner on bond" is, at best, a mischaracterization of the record. (Supp. Reply at 8.) Respondents' response to the Petition did not confirm that a bond redetermination hearing had been scheduled, but rather included Costakis' representation that ICE was still "in the process" of transmitting Mr. Andradez Materan's May 4, 2026, request, which had been made more than three weeks earlier. (Costakis Decl. ¶ 18.) Moreover, no hearing was scheduled until June 1, 2026, when the parties appeared before this Court for the first time and Respondents' counsel produced a bond hearing notice dated June 1, 2026. (June 1 Hr'g Tr. 8:7–9.) Most importantly, as explained at length above—the bond hearing was scheduled to take place from the MDC in Brooklyn on the same date and starting just 30 minutes after the commencement of Mr. Andradez Materan's criminal court proceeding in Long Island. Respondents have no explanation for how Mr. Andradez Materan could be in two places at the same time, took no steps to ensure that he would not fail to appear at either proceeding, and do not dispute that they failed to notice this conflict until the Court brought it to their attention.

Fourth, Respondents invoke *O.F.C. v. Almodovar*, No. 25-cv-9816, 2026 WL 74262, at *6–7 (S.D.N.Y. Jan. 9, 2026), where the district court held, in part, that a habeas petitioner is not entitled to a bond hearing before an arrest and detention by ICE. Here, Mr. Andradez Materan does not argue that he was entitled to a formal hearing prior to being arrested by ICE. Rather, he simply argues that he was given no opportunity to be heard on the issue of whether he violated a condition of his OREC, and the related questions of whether he poses a risk of flight or dangerousness, before being detained pursuant to the revocation. (*See* June 5 Hr'g Tr. 168:8–14.)

For all of these reasons, the procedures used by ICE to arrest and detain Mr. Andradez Materan violate the agency's own regulations and fail to give Mr. Andradez Materan an opportunity to be heard, thereby creating a substantial risk of erroneous deprivation.

## IV. Remedy

Upon finding a constitutional violation, a district court "may" grant a writ of habeas corpus and "dispose of the matter as law and justice require." 28 U.S.C §§ 2241(a), 2243. Release from detention is the "typical remedy" for "unlawful executive detention." *Munaf v. Geren*, 553 U.S. 674, 693 (2008).

On June 5, 2026, after Mr. Andradez Materan had been detained for 32 days, this Court ordered Mr. Andradez Materan's release on bond subject to certain conditions pending resolution of the substantial due process claims in the Petition. (*See* ECF Nos. 17, 18; Min. Entry, June 5, 2026.) Because this Court now concludes that ICE detained Mr. Andradez Materan without providing him notice and an opportunity to be heard in violation of his right to due process, his detention in ICE custody, which began on May 4, 2026, was unlawful from its inception. Accordingly, "dispos[ing] of the matter as law and justice require," 28 U.S.C. § 2243, now

requires this Court to release Mr. Andradez Materan from the bond conditions to which he has been subject since June 5, 2026.

This Court thus orders Mr. Andradez Materan's release and removes the conditions of release set forth in this Court's Order granting release on bond. (*See* ECF Nos. 17, 18.)

**CONCLUSION**

Accordingly, for all of the reasons explained in this Opinion and Order, the Petition is GRANTED in part. Mr. Andradez Materan is now released from the conditions of release set forth in this Court's June 5, 2026, Order releasing him on bail.

At this time, the Court reserves ruling on the request for attorneys' fees and costs under the Equal Access to Justice Act set forth in the Petition. Counsel for Mr. Andradez Materan may file an application for attorneys' fees and costs incurred in pursuing this action by **November 23, 2026**.

The Court concludes that the other arguments set forth in the Petition for granting Mr. Andradez Materan the requested relief, including his arguments under the Administrative Procedure Act and the Fourth Amendment, are now moot and unnecessary to resolve.

Dated: Central Islip, New York
October 25, 2026

*/s/ Nusrat J. Choudhury*
NUSRAT J. CHOUDHURY
United States District Judge